UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
INGRID COTTERELL INGRAM,[1]

                     Plaintiff,

      -against-

REBECCA MACDONALD, *et al.*,

                    Defendants.
----------------------------------------------------------x

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
SEP 20 2012
BROOKLYN OFFICE

**MEMORANDUM AND ORDER**

10-CV-3859 (SLT) (LB)

**TOWNES, United States District Judge:**

      Plaintiff Ingrid Cotterell-Ingram – a black woman and a native of the nation of Jamaica –

brings this employment discrimination action against defendant Just Energy ("Defendant" or

"Just Energy"), a Canadian-based energy supply company (or "ESCO") for which plaintiff once

worked. Defendant now moves for summary judgment, arguing that plaintiff cannot make out a

*prima facie* case of discrimination; that Defendant has presented a legitimate, non-discriminatory

reason for terminating plaintiff and that plaintiff cannot demonstrate that Defendant's reasons are

a pretext for discrimination. For the reasons set forth below, Defendant's motion is granted.

**BACKGROUND**

*Just Energy's Business*

      Defendant is an independent energy supplier, providing natural gas and electricity to both

residential and commercial customers (Defendant's Statement of Undisputed Material Facts

Pursuant to Local Rule 56.1 ["Def. 56.1"] at ¶4; Plaintiff's Supplemental Counterstatement to

Defendant's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ["Pl. Supp.

56.1"] at ¶4). Defendant sells its products and services door-to-door through sales

---

      [1]Although plaintiff signed the complaint as Ingrid Cotterell-Ingram, the caption of the
complaint referred to plaintiff as Ingrid Cotterell Ingram. Accordingly, in this case and a related
action – *Johnson v. MacDonald*, E.D.N.Y. Docket No. 10-CV-3699 – plaintiff is referred to as
"Ingram" rather than "Cotterell-Ingram."

representatives, which it calls "Independent Contractors" or "ICs" (Def. 56.1 at ¶6; Pl. Supp. 56.1 at ¶6). Defendant's sales representatives are paid a commission for each contract they procure on Defendant's behalf (Pl. Supp. 56.1 at ¶15). Plaintiff alleges that she was told she would also receive residual payments on the customers she "registered" (Complaint at 3).

It is undisputed that Defendant occasionally offers trips to vacation destinations around the world as a further sales incentive (Def. 56.1 at ¶53; Teixeira at ¶8). To qualify for one of these trips, a sales representative must, through his or her sales, earn a certain number of "points" during a specific period (id.).

Defendant claims, and plaintiff does not deny, that Defendant's business is regulated by the State of New York (Def. 56.1 at ¶11; Teixeira Aff. at ¶6). As explained in a December 13, 2010, decision issued by Administrative Law Judge Henry A. Sullivan of the Unemployment Insurance Appeals Board (attached as Ex. 31 to the Declaration of Rebecca Tingey in Support of Defendant's Motion for Summary Judgment [the "Tingey Declaration"]):

> [T]he Uniform Business Practices regulations ("UBP") of the New York Public Service Commission ("PSC") . . . set[s] forth required business procedures for both ESCO's [sic] and their marketing representatives. More specifically, the regulations require ESCO's [sic] to ensure that their training of marketing representatives includes knowledge of: the UBP; the ESCO's products, services, rate[s] and fees; the customers' right to cancel; the Home Energy Fair Practices Act that pertain[s] to residential customers; and the ability to provide the customer with a toll-free telephone number from which the customer may obtain information about the ECSO's mechanisms for handling billing questions, disputes and complaints. The UBP also prescribe various provisions that ESCO's [sic] must include in their sales agreements with customers.

*Id.* at 3 (bracketed material added). Defendant can be investigated and subjected to disciplinary procedures, fines, and litigation if the marketing activity of one of its sales representatives does not comply with applicable laws and regulations (Def. 56.1 at ¶12; *see* Pl. Supp. 56.1 at ¶12).[2]

Defendant operates through "regional offices," each of which is headed by a regional distributor or manager (Def. 56.1 at ¶7; Teixeira Aff. at ¶4). To ensure that its sales representatives have the most current marketing materials and information, a sales representative must visit his or her regional office on a regular basis (Def. 56.1 at ¶11; *see* Pl. Supp. 56.1 at ¶11).[3] The regional distributor is responsible for the marketing behavior of the sales representatives assigned to his or her office (Def. 56.1 at ¶8; Pl. Supp. 56.1 at ¶8). Accordingly, each sales representative markets from one regional office at a time (Def. 56.1 at ¶9; Pl. Supp. 56.1 at ¶9). If a sales representative wants to market from a different office, that transfer must be approved by the "head office" or "corporate office" (Def. 56.1 at ¶10; Pl. Supp. 56.1 at ¶10).

_____

[2]Although plaintiff does not expressly admit that Defendant is subject to sanctions for the violation of applicable laws and regulations, plaintiff makes no effort to controvert this claim. Rather, plaintiff notes only that there is no evidence that Defendant suffered any consequences as a result of plaintiff's conduct. Pl. Supp. 56.1 at ¶12. Accordingly, Defendant's claim that Just Energy can be "investigated and subject to disciplinary procedures, fines and litigation" if the marketing activity of one of its sales representatives does not comply with applicable laws and regulations is deemed admitted. *See* Local Rule 56.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York (uncontroverted allegations in a statement of material facts pursuant to Local Rule 56.1 are deemed admitted).

[3]Plaintiff acknowledges, but does not specifically controvert, Defendant's claim that sales representatives must visit their regional offices on a regular basis in order to obtain the updated materials and information that they are required to have under applicable laws and regulations. Pl. Supp. 56.1 at ¶11. Accordingly, this claim is deemed admitted. *See* Local Rule 56.1(c).

*Plaintiff's History at Just Energy*

Except where otherwise indicated, the following facts are either undisputed, based on documentary evidence, or drawn from plaintiff's submissions or her June 29, 2011, deposition. Although all of plaintiff's submissions are unsworn, this Court assumes, for purposes of this Memorandum and Order, that the *pro se* plaintiff would be prepared to swear to the truth of the allegations contained therein.

On or about October 19, 2007, plaintiff started working for Defendant – then known as either US Energy Savings Corp. or Energy Savings Marketing Corp. – as a sales representative in its office in Kew Gardens, Queens (Def. 56.1 at ¶¶14, 19; Plaintiff's Counterstatement in Opposition to Defendants' Statement of Undisputed Facts Pursuant to Local Rule 56.1 ["Pl. 56.1"] at 1). There, plaintiff was trained by Norman Johnson, a Jamaican man who was then an Assistant Crew Coordinator (Deposition of Ingrid Cotterell Ingram ["Pl. EBT"] at 76). According to plaintiff, Johnson "care[d] about everyone he train[ed]" (*id.*), and "looked out for plaintiff[']s best interest[s]" (Plaintiff's Cross Motion in Opposition to Defendant's Motion for Summary Judgment ["Plaintiff's Cross Motion"] at 1). For example, Johnson "would make sure he knew where plaintiff [was] at all times and who plaintiff was last talking with" (*id.*). Although plaintiff alleges that Johnson worked this way "with every individual he took into the field" (*id.*), she also concedes that she and Johnson "became friends" and that they marketed together throughout her tenure at Just Energy (Pl. EBT at 76, 144).

At all time relevant to this action, the regional distributor or manager of the Kew Gardens Office was a man named Chad Langford. According to plaintiff, Langford was "brutal" (*id.* at 156) and "mean to the entire office" in that he demanded that the sales representatives work seven days a week and generate 50 or more "deals" a week (Plaintiff's Cross Motion at 8).

However, plaintiff testified at her deposition that Langford was especially mean to her, cursing at her and calling or texting her in the middle of the day to threaten that she would be terminated unless she made ten deals that day (Pl. EBT at 155-56).

Sometime in 2008, plaintiff and Johnson transferred from the Kew Gardens Office to Defendant's Bronx office (Def. 56.1 at ¶22; Pl. Supp. 56.1 at ¶20). Although the parties' submissions do not explain why plaintiff and Johnson left, Defendant implies – and plaintiff does not deny – that the transfer was voluntary (Def. 56.1 at ¶22). Later in 2008, however, the Bronx office was closed (Plaintiff's Cross Motion at 1). According to plaintiff, Just Energy's CEO gave the Bronx sales representatives the option of going to the Kew Gardens or Brooklyn offices (id.; Pl. EBT at 124). Plaintiff and Johnson elected to go the Brooklyn Office (id.).

Both plaintiff and Johnson were working in the Brooklyn Office when Langford asked them to return to the Kew Gardens Office (Pl. Supp. 56.1 at ¶21; Def. 56.1 at ¶24). Plaintiff implies that Langford forced them to meet with him by arranging to have their paychecks sent to the Kew Gardens Office (Plaintiff's Cross Motion at 1-2). The first time plaintiff and Johnson went to Kew Gardens to retrieve their checks, Langford approached them and told them that he needed their help to win the "Office of the Year" award (id.). Plaintiff and Johnson told Langford they would "think about it" (id. at 2). However, their checks continued to be sent to the Kew Gardens Office (id.). When they went to retrieve their checks for a second time, Langford again asked them to return (id.). At some point, Langford offered them incentives to return, telling them that they would not have to attend morning meetings and that Johnson would receive "his own override" (id.).

In mid-2008, plaintiff and Johnson finally agreed to return (id.; Pl. Supp. 56.1 at ¶24; Def. 56.1 at ¶24). Plaintiff's Cross Motion states that this decision was "based on the fact that

[plaintiff and Johnson] had come to the conclusion that Cyrus[,] the Brooklyn Office regional manager[,] was no better than . . . Langford" (Plaintiff's Cross Motion at 2) (bracketed material added). However, Plaintiff's Cross Motion also suggests that they decided to return after plaintiff was terminated, stating:

> One day plaintiff and Mr. Johnson went into the field and plaintiff wrote no deals[.] [T]he following day Cyrus told plaintiff to give him her badge and get out of his office so we went back to Chad (*id.*).

According to plaintiff, Langford "got a little happy" when plaintiff and Johnson agreed to return (*id.*).

Following plaintiff's return, the Kew Gardens Office won the "Office of the Year" award for 2008 (Teixeira at ¶14). Plaintiff played a part in that success, producing enough deals to qualify for a trip to Australia that was scheduled to begin March 5, 2009 (Pl. Supp. 56.1 at ¶25; Def. 56.1 at ¶56). Moreover, according to an "IC Summary" produced by Defendant, plaintiff had only three customer complaints lodged against her in all of 2008 (Tingey Declaration, Ex. 23).

Nonetheless, Langford was "really mean" to plaintiff (Pl. EBT at 164). In contrast, Langford was not mean to Johnson (*id.* at 182), and did not want Johnson to work with plaintiff (*id.* at 82). At her deposition, plaintiff concluded that Langford did not like her and blamed her for Johnson's defection to the Bronx Office (*id.* at 155, 164, 182).

The parties agree that plaintiff left the Kew Garden Office yet again in January 2009 (Def. 56.1 at ¶29; Pl. Supp. 56.1 at ¶26), but disagree as to why she left. Defendant asserts that plaintiff "chose to leave" Kew Gardens in order to market from the Wall Street Office (Def. 56.1 at ¶29). However, the only evidence cited by Defendant in support of this proposition is a

portion of plaintiff's own deposition, which does not substantiate Defendant's claim (*id.*, citing Pl. EBT at 124-25).[4]

Plaintiff, in contrast, claims that she only left the Kew Gardens Office because Langford fired her (Plaintiff's Cross Motion at 2; Pl. Supp. 56.1 at ¶26). Indeed, Plaintiff's Cross Motion describes in detail the circumstances that led to her termination. According to plaintiff, one Sunday in 2009, Langford instructed her "not to go with Mr. Johnson," but to go into the field with another sales representative named Spencer Shield (Plaintiff's Cross Motion at 2). Plaintiff initially obeyed his directive (*id.*). However, when Shield began smoking marijuana, she and another sales representative – Khani Sanders – left Shield (*id.*). Sanders and plaintiff apparently worked together for the remainder of the day, but without much success. Sanders secured one contract, but plaintiff closed no deals (*id.*, Pl. EBT at 166).

_____

[4]Prior to the cited portion of plaintiff's deposition, Defendant's counsel attempted to establish the "progression" of offices at which plaintiff worked and the approximate dates of plaintiff's move from office to office (Pl. EBT at 123-24). Defendant's counsel established that plaintiff last worked at the Wall Street Office, then attempted to establish the approximate date of the move as follows:

> Q: So going back to Bates number 89, we just discussed that starting around January of 2009 you started marketing under the Wall Street badge number, which is 913879, correct?
>
> A: Correct.
>
> Q: And does that correspond with your memory that you transferred to the Wall Street office around January 2009?
>
> A: I think so. I'm not sure (Pl. EBT at 124-25).

Although the focus of the questioning was the timing of the move, rather than the circumstances that prompted the move, Defendant reads this exchange as supporting the proposition that plaintiff's move was voluntary.

The next day, Langford called plaintiff and Sanders into his office, where he asked plaintiff why she had written no business and why she had left Shield (Plaintiff's Cross Motion at 2). In response to the latter question, plaintiff told Langford that Shield was smoking marijuana (*id.*). Langford asked Sanders to corroborate plaintiff's claim, but Sanders "became mute" (*id.*). Langford then fired plaintiff and suspended Sanders (*id.*). The next day, Langford apprised Johnson of this development by placing a "yellow sticky note" on his check which read, "I got rid of Ingrid for you" (*id.*).

On January 15, 2009, plaintiff signed a new Independent Contractor Agreement ("ICA") with the Wall Street Office, which is attached to the Tingey Declaration as Exhibit 21. That agreement included a rider, entitled a "New York AOD Obligations Certification." This document alluded to an agreement which Defendant had entered into "in order to resolve the concerns of the New York Attorney General in connection with allegations they received about some contractors' conduct." Although the rider did not attach a copy of that agreement – called an "Assurance of Discontinuance" or "AOD" – it informed plaintiff:

> You **WILL** have your agreement with Energy Saving Marketing Corp. (ESMC) terminated if, on more than two occasions in any 12 month period, it is determined by ESMC that you: did not identify yourself fully and properly, including that you do not represent the utility; or promised savings; or failed to state the term and price of the agreement (Tingey Declaration, Ex. 21) (emphasis in original).

Plaintiff signed the rider (*id.*).

On January 15, 2009 – the very day on which plaintiff signed the ICA with the Wall Street Office – plaintiff electronically registered for the Australian trip on a website created for that purpose by Pareto, a marketing company in Toronto, Ontario, that organizes Defendant's sales incentive trips (Pl. EBT at 30; Tingey Declaration, Ex. 22). Plaintiff had "trouble with the

computer," and enlisted the help of a secretary in completing the registration (Pl. EBT at 30). However, plaintiff remained "in front of the computer screen" throughout the registration process and was, therefore, in position to read any information supplied by the website (*id.* at 30-31).

The online registration form requested, *inter alia,* plaintiff's agent number and regional office and her preferred roommate (*id.* at 31). Although plaintiff was working from the Wall Street Office by that time, she listed Kew Gardens as her office and provided the agent number she had used at Kew Gardens (*id.*). Plaintiff also named Johnson as her preferred roommate (*id.* at 75). However, plaintiff testified at her deposition that she did so only to upset Langford, in order to retaliate for her firing (*id.* at 75, 81-82).

According to Megan Taylor, a Senior Program Manager in the Events Division of Pareto, the website advised registrants of the paperwork necessary to enter Australia as follows:

> Entry Requirements Australia:
>
> Canadian and American citizens require a valid passport and visa to enter Australia. Passports must be valid six (6) months beyond the return date of travel. Please scan your passport and email to mtaylor@pareto.ca to obtain a visa. Your passport must be sent no later than January 31st to ensure enough time to process your visa.
>
> If you do not hold a Canadian or American passport please contact the Fiji and Australian Consulate near you to find out what you require for travel.

(Affidavit of Megan Taylor, dated Dec. 15, 2011 ["Taylor Aff."], at ¶7). Plaintiff, however, never saw this notice (Pl. EBT at 43). The secretary who assisted plaintiff in completing the registration may have seen it, for she asked plaintiff to bring in her passport (Pl. EBT at 33). When plaintiff brought her a copy of her Jamaican passport and green card, the secretary copied the documents and faxed the copies to the head office (*id.*).

In response to the secretary's transmission, someone named "Lisa" received a message advising that, since plaintiff held a Jamaican passport, she would need to apply for a visa herself (*id.* at 43). Plaintiff, however, never received the message and remained unaware that she was responsible for obtaining her own visa (*id.*). Indeed, based on Johnson's experiences with a trip to Brazil in 2007, plaintiff believed that Just Energy would obtain the visa for her (*id.* at 42, 66). Accordingly, plaintiff never contacted the Australian consulate, researched Australia's visa requirements, or made any attempt to obtain a visa (*id.* at 32-33).

At some juncture, plaintiff made telephone inquiries about her itinerary, which had not arrived at the Wall Street Office (*id.* at 40). Taylor told her that it had been sent to the Kew Gardens Office (Plaintiff's Cross Motion at 5). However, when plaintiff called Kew Gardens, Langford denied having her itinerary (*id.*).

Plaintiff did not actually obtain the itinerary until sometime after February 25, 2009 (Pl. EBT at 67). At her deposition, plaintiff described in detail the circumstances under which she obtained a copy of her itinerary. According to plaintiff, Langford telephoned Johnson on February 25, 2009, to say that he had Johnson's itinerary (*id.*). Langford did not tell Johnson whether he also had plaintiff's itinerary, but Johnson told plaintiff to accompany him to the Kew Gardens Office nonetheless (*id.*). However, the two did not actually go to the Kew Gardens Office until February 27, 2009 – two days after Langford's call and approximately one week before the trip was to begin (*id.* at 261).

During the February 27 visit, plaintiff and Johnson both received copies of their itineraries from Liz Beth Delgado, a secretary at the Kew Gardens Office (*id.* at 67-68). At her deposition, plaintiff testified that Delgado told them that the itineraries had arrived "a long time" before and that "everyone had already received theirs" (*id.* at 73). Delgado also implied that

10

Langford had deliberately withheld their itineraries, saying she "didn't know why Chad did this" (*id.* at 67).

Delgado telephoned the Australian consulate in an effort to assist plaintiff and Johnson in obtaining "rush" visas, but had no success (*id.* at 67). However, plaintiff and Johnson did not visit the Australian consulate themselves until March 2, 2009 (*id.* at 261). The consulate informed them that it would take 15 days to receive a visa (*id.* at 79). Accordingly, plaintiff and Johnson were unable to go on the trip.

In April 2009, Johnson started working for the Wall Street Office in Manhattan, where he was reunited with plaintiff. According to Shanda Walker, one of their co-workers, the regional distributor who was then in charge of the Wall Street Office – Ali Mamune – conducted meetings only once a week (Affidavit of Shanda Walker ["Walker Aff."] at 1). Accordingly, the "outside workers" visited the office only on Mondays to attend the meeting and to turn in their contracts (*id.*).

In November 2009, Mamune was replaced as regional distributor by a man named Ali Zamany (*id.*; Affidavit of Ali Zamany, dated Dec. 22, 2011 ["Zamany Aff."] at ¶2). According to both plaintiff and Walker, Mamune convened a conference to introduce Zamany to the staff (Plaintiff's Cross Motion at 9-10; Walker Aff. at 1). Zamany told everyone to continue doing what they were doing (Walker Aff. at 1). Plaintiff and Johnson apparently interpreted this statement to mean that they could continue visiting the office only once a week.

According to the "IC Summary" produced by Defendant, plaintiff was the subject to two customer complaints in September 2010. In the first, the customer complained that she had not signed the agreement which bore her name (Tingey Declaration, Ex. 23). In the second, the customer alleged that she had been promised savings (*id.*). In both cases, Just Energy cancelled

11

the customer's contract (*id.*). Plaintiff does not deny that these complaints were made but argues that they were meritless.

In February 2010, yet another customer complained about plaintiff, alleging that the she had not authorized a change in her electricity account (*id.*). On March 16, 2010, Wayne Morgan, a Team Leader in Defendant's Corporate and Consumer Relations Department, sent Zamany an e-mail directing him to have plaintiff and Johnson come into the office to discuss their "compliance ratios" (Tingey Declaration, Ex. 24; Zamany Aff. at ¶3). On March 22, 2010, Zamany had a conference call regarding plaintiff and Johnson with Defendant's Compliance manager, Vanessa Anesetti, and Humera Siddiqui, Defendant's Regional Sales Manager for Eastern United States Sales (Tingey Declaration, Ex. 25).

On the morning of March 22, 2010, Anesetti sent Morgan an e-mail describing the substance of the conversation she and Siddiqui had just had with Zamany. According to Anesetti, Zamany claimed that plaintiff and Johnson did not show up to sales meetings and were "affecting his office demeanor and stats" (*id.*). Noting that he had not trained plaintiff and Johnson, but was "responsible for any RD [regional distributor] consequence associated to their complaints," Zamany complained that it was "unfair that he . . . inherited all these issues and that his office [numbers] look worse than they really are . . . " (*id.*).

Zamany and Siddiqui wanted the Corporate and Consumer Relations Department to "complete a call with [plaintiff and Johnson] and put them on their final warning" (*id.*). Anesetti, however, reviewed their compliance records and found that their "allegation ratios" did not warrant such an action (*id.*). Instead, she recommended having a call with plaintiff and Johnson "to discuss the importance of them showing up to their meetings, taking direction from [Zamany] and going through [Zamany's] reorientation" (*id.*).

12

The parties disagree as to whether such a call took place. Zamany states that he, Morgan and Siddiqui had a conference call with plaintiff and Johnson on March 29, 2010, during which he advised the two sales representatives that "due to their high allegation ratios, if they wanted to continue to market and receive office support from the Wall Street office, they would have to come by the office regularly to receive up to date information regarding Just Energy products and compliance with applicable legal and/or regulatory requirements" (Zamany Aff. at ¶5). Plaintiff denies that Morgan or Siddiqui spoke to her on March 29, 2010 (Pl. Supp. 56.1 at ¶28). Rather, plaintiff recalls that on March 29, 2010, after Zamany finished talking on the telephone, "he turned to plaintiff and Mr. Johnson and said if you guys want to continue working in this office you have to start coming in five days per week" (Plaintiff's Cross Motion at 6; Pl. Supp. 56.1 at ¶29).

According to the IC Summary, plaintiff was the subject of two more customer complaints in April and May 2010. On April 24, 2010, a customer complained that plaintiff had promised that her bill would be lower if she switched to Just Energy (Tingey Declaration, Ex. 23). On May 26, 2010, a customer asked to cancel a contract on the ground that the contract listed an incorrect account number and address (id.). Plaintiff does not deny that these complaint were made, but explains why each complaint was without merit (Plaintiff's Cross Motion at 9).

In mid-2010, workers in the Wall Street Office were discovered to be engaged in fraudulent practices (id. at 4). According to plaintiff, Zamany stopped conducting morning meetings and Adler Porter, plaintiff's crew coordinator, informed plaintiff that there would be no more meetings until further notice (Pl. 56.1 at 1). Thereafter, plaintiff started visiting the office only on Mondays (id.).

13

In July 2008, the Wall Street Office closed. According to Zamany, he announced the closure on July 8, 2010, and told the sales representatives to report to the Kew Gardens Office immediately (Zamany Aff. at ¶7). However, since July 8 was a Thursday, plaintiff never received this information from Zamany (Pl. Supp. 56.1 at ¶30). Rather, she learned of the closure sometime later, after Johnson received a call from a co-worker who told him to report to Kew Gardens (Pl. EBT at 100).

It is unclear exactly when plaintiff and Johnson reported to the Kew Gardens Office. At her deposition, plaintiff could not recall the exact date on which Johnson received the call, but testified that she and Johnson went to the Kew Gardens Office a week or two after receiving this call (id.). However, on an Errata Sheet prepared approximately two months after her deposition, plaintiff stated that she and Johnson went to Kew Gardens the same day that Johnson received the call (id. at 261). In her original Rule 56.1 statement, plaintiff implied that she had testified at her deposition that she went to Kew Gardens one week after the Wall Street Office closed, but characterized this testimony as inaccurate (Pl. 56.1 at 2). Johnson, in contrast, specifically recalled that the co-worker called on July 13, 2010, and that he and plaintiff went to the Kew Gardens Office later that same day (Deposition of Norman Johnson ["Johnson EBT"] at 100).[5]

When plaintiff and Johnson arrived at the Kew Gardens Office, Langford refused to admit them (Complaint at 3). Thereafter, plaintiff received a call from Siddiqui and Morgan, who allegedly told plaintiff that there was no room in the Kew Gardens Office and that they had no choice but to terminate her (id.). Although plaintiff's complaint alleges that this conversation took place on July 19, 2010 (id.), Defendant has produced an e-mail dated July 20, 2010, in

_____

[5]The transcript of Johnson's June 16, 2011, deposition is attached to the Tingey Declaration as Exhibit 1.

which Siddiqui informed Morgan of her decision not to permit plaintiff and Johnson to market on their own (Tingey Declaration, Ex. 26). That e-mail states:

> Since the closure of the Wall Street office, Ingrid Coterell [*sic*] Ingram . . . & Norman Johnson . . . wanted to continue to market on their own[. H]owever Sales feels they would potentially pose a risk to our business without the leadership and guidance of a Regional and the benefits of visiting a Regional office on a regular basis. Please be advised that Sales has decided to terminate the IC agreements for [plaintiff and Johnson] effective immediately (*id.*).

Defendant has also produced a letter dated July 21, 2010, from James Herod, Defendant's Senior Vice President of Sales and Marketing, which informed plaintiff that her Independent Contractor Agreement had been terminated effective July 19, 2010, "as a result of [plaintiff's] breach thereof" (Tingey Declaration, Ex. 27).

***The Instant Action***

On August 18, 2010, plaintiff, proceeding *pro se*, commenced this action against Defendant and eight individuals employed at Just Energy's Canadian headquarters, including Siddiqui, Morgan, and Herod. Plaintiff did not mention her race, age, or national origin, but alleged that this Court had jurisdiction under 28 U.S.C. §1331, that the defendants had discriminated against her, and that she had contacted the Equal Employment Opportunity Commission ("EEOC") in Manhattan (Complaint at 2-4). Plaintiff did not attach a right-to-sue letter, alleging instead that the EEOC had told her that "there was no jurisdiction" (*id.* at 2).

Although Langford was not among the defendants named in the caption, Langford was mentioned repeatedly in the complaint. The pleading noted, *inter alia*, that Langford demanded that all sales representatives work seven days a week and turn in 50 or more deals per week, and threatened to terminate those who failed to comply with these demands (*id.* at 3). In addition, the complaint alleged that Langford had asked plaintiff to return to his office to help him win "Office

15

of the Year," but reverted to "his old ways" of cursing at plaintiff and "telling her to get the fuck out of his office" once he won the award (*id.*). However, the complaint did not allege that Langford had fired plaintiff, stating that she "sought a transfer to the Wall Street Office" (*id.*).

The only termination alleged in the complaint was the July 2010 termination. The complaint alleged that "most" of the sales representatives from the Wall Street Office were accepted by Langford, but that plaintiff and Johnson were not (*id.*). The pleading also implied that Morgan and Siddiqui had lied about the reason for terminating plaintiff, first telling her that there was no room at the Kew Gardens Office and then sending her a letter alleging that she was being terminated for breach of contract (*id.* at 3-4). In addition, the complaint suggested that Defendant had wrongfully withheld plaintiff's residual payments, specifically alleging that Siddiqui had rebuffed plaintiff's request for those payments during their July 19, 2010, conversation by telling plaintiff that she did not "have shit to get" (*id.* at 3).

On October 11, 2010, the defendants moved to dismiss the complaint pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure. Although all nine defendants were represented by the same attorneys, Defendant and the eight individual defendants filed separate memoranda of law in support of the motion. Defendant argued that the complaint failed to satisfy the notice pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure and that, if plaintiff was attempting to assert a claim under the federal equal employment opportunity laws, the claim was barred for failure to exhaust administrative remedies. The individual defendants not only incorporated these arguments by reference, but also argued that this Court lacked personal jurisdiction over them and that individuals cannot be liable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.* ("Title VII") and other federal equal employment opportunity laws.

On October 26, 2010, along with her response to defendants' motion, plaintiff filed a three-page document entitled, "To Amend Complaint in Order to Add Chad Langford as Defendant" (*see* Document 45). This document detailed the inhumane manner in which Langford treated the sales representatives in his office and alleged, for the first time, that Langford had fired plaintiff. Although the document made no reference to plaintiff's gender, race, color, or national origin and implied that Langford treated all sales assistants badly, it asserted that the "question presented" by this case was "Whether or not defendants [*sic*] discrimination is based on gender, race[,] color or National Origin" and cited to Title VII, the New York Human Rights Law, and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution (*id.* at 3).

On November 16, 2010 – less than two weeks after defendants filed their replies in support of the motion to dismiss – plaintiff filed a document entitled "Leave to Amend Pleading" (the "Proposed Amendment"). That document specifically alleged that plaintiff was a "36 Year Old Black Female who is a Native of Jamaica," and asserted "that Just Energy . . . Discriminated Against [plaintiff] on the basic [*sic*] Of National Origin and Race" (*id.* at 1). In addition, the Proposed Amendment clarified that plaintiff's allegations of discrimination related to three incidents: plaintiff's termination by Langford, Langford's subsequent actions relating to her itinerary for the trip to Australia, and plaintiff's termination in July 2010.

With respect to the first of these incidents, the Proposed Amendment only briefly described how Langford had called her and Sanders into his office to demand an explanation for their lack of production (Proposed Amendment at 2). It omitted any mention of plaintiff's decision not to market with Shield, as Langford had directed. Rather, the document implied

17

discrimination by noting that plaintiff had been terminated, while Sanders had only been suspended (*id.*).

With respect to the second incident, the Proposed Amendment asserted that Langford deliberately withheld her itinerary, knowing that she would need to apply for a visa at least fifteen days before departure in order to make the trip to Australia. The document alleged that Langford received all of the itineraries from the head office at the same time, but distributed them to other sales representatives "ahead of [the] time" he finally gave plaintiff her itinerary (*id.* at 3). The Proposed Amendment did not specifically allege that Langford was motivated by discriminatory animus, but noted that Langford "did the same thing to Norman Johnson," who was also Jamaican (*id.*).

With respect to the third incident, the Proposed Amendment stated that plaintiff "was terminated in a discriminatory manner" (*id.* at 2). The document alleged that plaintiff "received unequal treatment" because other workers from the Wall Street Office were admitted to Kew Gardens while plaintiff was not (*id.*). Specifically, the Proposed Amendment alleged that none of the workers from the Wall Street Office who were admitted to the Kew Gardens Office were Jamaican, and that plaintiff and Johnson – both of whom were Jamaicans – were not admitted (*id.*). In addition, the Proposed Amendment alleged that "other workers were allow[ed] to work in the absent [*sic*] of an Office base" and that Just Energy had never terminated a worker who produced as much as plaintiff absent "some kind of Fraudulent Business Transaction" (*id.*).

The Proposed Amendment also alleged facts suggesting that plaintiff was an employee, rather than an independent contractor, and was made to work seven days a week. However, the Proposed Amendment made no reference to the Fair Labor Standards Act or related state laws.

In addition, the Proposed Amendment contained no allegations relating to Defendant's alleged failure to make residual payments.

On November 18, 2010, Judge Weinstein – the judge who was then presiding over this case – held oral argument on the motion to dismiss and the motions to amend. Judge Weinstein orally granted that portion of the defendants' motion which sought to dismiss the claims against the individual defendants for lack of personal jurisdiction (Transcript of the Nov. 18, 2010 Proceedings [Document 57] at 3). However, Judge Weinstein declined to dismiss the claims against Just Energy on the pleadings, telling the defendants' counsel to "[m]ake a motion for summary judgment" (*id.*). Although plaintiff admitted that she had never filed a charge of discrimination, Judge Weinstein rejected the defendants' oral request that the case be dismissed without prejudice (*id.* at 5). Rather, the judge, acting *sua sponte*, held the case in abeyance to permit plaintiff the opportunity to exhaust her administrative remedies (*id.*).

With respect to plaintiff's motion to amend, the defendants' counsel noted that Judge Weinstein's ruling on the motion to dismiss the individual defendants made it unnecessary to respond to the motion for leave to amend the complaint to add Langford as a defendant. However, counsel also stated that defendants did not oppose "plaintiff's effort to add any factual allegations" (*id.* at 3). Accordingly, Judge Weinstein orally granted plaintiff leave to amend her complaint, saying "You can amend your complaint" (*id.*).[6] Plaintiff immediately responded, "I've done that" (*id.*), implying that she believed her Proposed Amendment constituted the amended complaint. Plaintiff never filed a formal amended complaint.

---

[6]Judge Weinstein's oral rulings were subsequently memorialized in a one-page order dated November 18, 2010 (Document 54).

On November 22, 2010, plaintiff filed a charge of discrimination with the EEOC (Tingey Declaration, Ex. 28). That charge made no mention of the Australian trip, but alleged that plaintiff had been "terminated without reason" on July 19, 2010 (*id.* at 2). However, the charge also alleged that Sanders, a United States citizen, had been treated better than plaintiff because she was only suspended when plaintiff was fired, and that another United States citizen, David Villaman, had been given the opportunity to work independently when plaintiff was not (*id.*). On November 30, 2010, the EEOC issued a right-to-sue notice upon plaintiff's request, noting that it was unlikely to be able to complete its administrative processing of the charge within 180 days of its filing (Tingey Declaration, Ex. 30). Less than one week later, this action was reassigned from Judge Weinstein to this Court.

### *Plaintiff's Deposition Testimony*

At her June 29, 2011, deposition, plaintiff discussed her theories of liability. First, plaintiff stated that neither race nor national origin discrimination played a part in Langford's decision to terminate her in January 2009 (Pl. EBT at 250-51). Rather, plaintiff repeatedly testified that Langford did not like her because he blamed her for causing Johnson to leave his office (*id.* at 164, 182-84). According to plaintiff, Langford was mean to her, but not to Johnson (*id.* at 181-82), and told both plaintiff and Johnson that he did not want them to work together (*id.* at 92). Plaintiff also conceded that Sanders, who was merely suspended at the time plaintiff was terminated, was herself a black woman of Jamaican descent (*id.* at 165-66).

Second, plaintiff claimed that Langford deliberately withheld plaintiff's itinerary because he did not want her to go on the trip (*id.* at 73). Plaintiff also speculated that Langford did not want her on the trip because she listed Johnson as her roommate (*id.* at 75). Plaintiff testified that she did not know whether she needed an itinerary in order to obtain a visa (*id.* at 66), but was

20

aware that two other sales representatives, including Sanders, had received their itineraries five days prior to the trip and had nonetheless gone to Australia (*id*. at 61-62).

Third, plaintiff clarified that she believed she had been terminated in July 2010 because of her national origin, and not because of her race (*id*. at 18). Plaintiff testified, however, that there was nothing besides the fact that she and Johnson were not allowed back into the Kew Gardens Office that made her believe that Defendant did not like Jamaicans (*id*. at 164). Plaintiff conceded that several of the sales representatives who worked at the Kew Gardens Office during her tenure were black and/or Jamaican, and that at least one sales representative who was half Chinese and half Jamaican continued to work at Kew Gardens at the time of plaintiff's deposition (*id*. at 216-22). Plaintiff further testified that at least three black sales representatives from the Wall Street Office were admitted to the Kew Gardens Office, and that she did not know the national origins of any of them (*id*. at 157, 161-63). In addition, plaintiff conceded that Jerome Jackson, a black man of Jamaican origin, was permitted to work independently after the Wall Street Office closed (*id*. at 171-72).

### *Defendant's Motion for Summary Judgment*

Defendant now moves for summary judgment. Construing plaintiff's pleadings as alleging discrimination on the basis of race and national origin in violation of Title VII, Defendant first argues that plaintiff has failed to make out a *prima facie* case of discrimination. Specifically, Defendant argues that plaintiff cannot establish that her termination and/or any adverse employment actions that occurred in connection with the Australian trip occurred under circumstances giving rise to an inference of discrimination.

Second, Defendant argues that, even if plaintiff has made out a *prima facie* case of discrimination, she cannot establish that Defendant's reasons for terminating its relationship with

21

plaintiff were pretexts for discrimination. Defendant implies that Langford refused to welcome plaintiff back to the Kew Gardens Office because of "Langford's experiences with Plaintiff during her prior two tenures" there (*see* Memorandum in Support of Defendant Just Energy's Motion for Summary Judgment ["Defendant's Memo"] at 17). Defendant further argues that plaintiff was not permitted to continue marketing on her own because of her "marketing history" (*id.* at 18). Defendant notes that plaintiff's pleadings do not allege that any of Defendant's employees ever made comments regarding plaintiff's race or national origin, and that plaintiff herself concedes that other black and/or Jamaican sales representatives were allowed to join the Kew Gardens Office and to market on their own.

In response to Defendant's motion, plaintiff submitted Plaintiff's Cross Motion, which incorporated an "Affirmation" signed by plaintiff. Plaintiff's Cross Motion, despite its title, does not request summary judgment in favor of plaintiff, but requests only that Defendant's motion for summary judgment be denied. Moreover, although the submission contains a lengthy discussion of the facts, both the "Cross Motion" and the "Affirmation" are unsworn.

In late March and early April 2012 – more than one month after the motion for summary judgment was fully briefed and filed with the Court – plaintiff filed four additional submissions: a document entitled "Plaintiff's supplemental motion to cross motion in opposition of defendant's motion for summary judgment," a "supplemental counter statement" to Defendant's statement of undisputed facts pursuant to Local Civil Rule 56.1, and sworn affidavits from Duane Matthews and Shanda Walker. In a letter dated April 5, 2012, Defendant characterized these submissions as "improper surreply" papers and requested that this Court strike them *sua sponte*. In the alternative, Defendant requested permission to move to strike or the opportunity to respond to the papers.

In a Memorandum and Order dated April 10, 2012, this Court found that these documents constituted unauthorized supplemental submissions. However, in light of plaintiff's *pro se* status, the Court decided to consider the two affidavits and the "supplemental counter statement" – *i.e.*, Pl. Supp. 56.1 – which more nearly satisfied the requirements of Local Civil Rule 56.1 than did the original counterstatement. The Court granted Defendant leave to submit proof in response to anything contained in the affidavits or to respond to the "supplemental counter statement" (Memorandum and Order dated Apr. 10, 2012, at 2). Although Defendant subsequently filed a three-page submission entitled, "Defendant Just Energy's Response to Plaintiffs' Surreplies," that document only reiterated positions stated in earlier submissions.

## *DISCUSSION*

### *I. The Summary Judgment Standard*

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may [, *inter alia*] . . . consider the fact undisputed for purposes of the motion [or] . . . grant summary judgment if the

23

motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

"[A] court reviewing a motion for summary judgment must view the evidence in the light most favorable to plaintiff and draw all reasonable inferences in her favor." *DiStiso v. Cook*, -- F.3d --, No. 10–4304–cv, 2012 WL 3570755, at *2 (2d Cir. Aug. 21, 2012) (citing *Amore v. Novarro*, 624 F.3d 522, 529 (2d Cir. 2010)). However, a court "cannot credit a plaintiff's merely speculative or conclusory assertions." *Id.* (citing *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008)). Moreover, "where a party relies on affidavits or deposition testimony to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'" *Id.* (quoting Fed. R. Civ. P. 56(c)(4)).

*Pro se* submissions are held to less stringent standards than submissions drafted by lawyers. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers."). Thus, a court must "read the pleadings of a *pro se* plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest.'" *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999). In addition, trial courts must be "especially cautious in deciding whether to grant . . . [summary judgment] in a discrimination case, because the employer's intent is often at issue and careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination." *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999). However, "the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to commercial or other areas of litigation." *Meiri v. Dacon*, 759

F.2d 989, 998 (2d Cir. 1985). Thus, in discrimination cases, as in all other civil cases, a plaintiff has the burden of presenting "concrete particulars" to substantiate his claims. *Id.*

### The McDonnell Douglas Framework

Reading plaintiff's pleadings liberally, plaintiff is alleging employment discrimination under the Title VII and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §290 *et seq*. Title VII discrimination claims are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *See Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012). This same framework also applies to discrimination claims under the NYSHRL. *See Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) (citing *Dawson v. Bumble & Bumble*, 398 F.3d 211, 216-17 (2d Cir. 2005)). Under the *McDonnell Douglas* burden-shifting framework:

> [P]laintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination. The burden of production then shifts to defendants, who must offer through the introduction of admissible evidence a non-discriminatory reason for their actions that, if believed by the trier of fact, would support a finding that unlawful discrimination was not a cause of the disputed employment action. Plaintiff then must show that the proffered reason was merely a pretext for discrimination, which may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more.

*Heyman v. Queens Village Committee for Mental Health for Jamaica Community Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir. 1999) (internal quotations and citations omitted).

Under Title VII and the NYSHRL, a plaintiff establishes a *prima facie* case of intentional discrimination by showing that "(1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action

took place under circumstances giving rise to [an] inference of discrimination." *Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012) (Title VII); *see Spiegel*, 604 F.3d at 80 (NYSHRL). Although the evidence necessary to establish plaintiff's initial burden has been characterized by the Second Circuit as "minimal" and "de minimis," *see Zimmermann v. Associates First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) (citing cases), it "is not non-existent." *Almond v. Westchester County Dep't of Corr.*, 425 F. Supp. 2d 394, 399 (S.D.N.Y. 2006). "[S]ummary judgment must be granted whenever the undisputed facts, viewed most favorably to the non-moving plaintiff, do not make out a *prima facie* case." *Id.* In addition, summary judgment is appropriate where the only evidence offered to prove the *prima facie* case is conclusory and insufficiently particular to permit a defendant to respond, since "[t]o allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all . . . cases." *Meiri*, 759 F.2d at 998.

In this case, Defendant concedes that plaintiff can establish the first three elements of his *prima facie* case, and argues only that the "[p]laintiff has brought forth no admissible evidence demonstrating that any adverse employment action occurred under circumstances that give rise to an inference of discrimination." Defendant's Memo at 11. Defendant's Memo principally addresses the circumstances surrounding plaintiff's termination, noting, *inter alia*, that plaintiff admitted (1) that representatives at the Kew Gardens Office were a "diverse group," (2) that another Jamaican, Jerome Jackson, was permitted to market on his own, (3) that Langford was difficult with all sales representatives, regardless of their race or national origin, and (4) that plaintiff herself attributed Langford's mistreatment to his personal dislike of plaintiff. *Id.* at 11-15. Although Defendant notes that plaintiff testified that she could not think of anything aside from her terminations that was discriminatory, Defendant also argues that "there is no evidence

of a causal connection between Plaintiff's inability to go on the trip [to Australia] and her race or national origin," *id.* at 17, and that any allegations regarding discrimination relating to the Australian trip are time-barred. *Id.* at 16, n. 7.

Plaintiff's responsive papers do not directly address Defendant's arguments. Rather, they contain numerous, unsworn allegations of facts, some of which relate to the incentive trip and plaintiff's terminations. Even assuming that Plaintiff's Cross Motion and the Affirmation appended thereto were sworn, however, none of those allegations establish that plaintiff suffered an adverse employment action under circumstances that give rise to an inference of discrimination.

### The Sales Incentive Trip to Australia

Preliminarily, this Court must determine whether plaintiff is raising a discrimination claim in connection with Langford's actions relating to the trip to Australia. Citing to a portion of plaintiff's deposition transcript in which plaintiff stated that she could not, at that moment, "think of anything else [other than Langford's refusal to welcome plaintiff back to the Kew Gardens Office] that happened during [her] time with Just Energy that . . . was discriminatory," Pl. EBT at 254, Defendant asserts that plaintiff's discrimination claims are "based solely on the denial of her transfer back to Kew Gardens after the Wall Street Office closed." Defendant's Memo at 16. However, plaintiff's Proposed Amendment discusses the Australian trip at length, alleging that Langford deliberately withheld plaintiff's and Johnson's itineraries in order to prevent them from going on the trip. Proposed Amendment at 3.

In light of plaintiff's *pro se* status, this Court construes the Proposed Amendment as an amended complaint. Read liberally, that document suggests that plaintiff intended to raise a discrimination claim relating to the Australian trip. Accordingly, this Court will address the

27

merits of Defendant's two arguments relating to this claim: (1) that the claim is time-barred and (2) that plaintiff has offered no admissible evidence that any adverse employment action plaintiff suffered in connection with the Australian trip took place under circumstances giving rise to an inference of discrimination.

The first of these arguments is raised solely in a footnote, in which Defendant observes that the trip to Australia took place in March 2009, but that plaintiff did not file a charge of discrimination with the EEOC until November 2010. Defendant's Memo at 16, n. 7. Defendant then reasons that, since EEOC claims must be filed within 300 days of the incident giving rise to the claim, plaintiff's claims regarding the Australian trip are time-barred. *Id.* (citing *Ragone v. Atlantic Video at Manhattan Ctr.*, 595 F.3d 115, 126 (2d Cir. 2010)).

"Exhaustion of administrative remedies through the EEOC is an essential element of the Title VII and ADEA statutory schemes and, as such, a precondition to bringing such claims in federal court." *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001) (per curiam) (internal quotation marks omitted). The time period for filing the charge of discrimination varies, depending on whether the individual files his charge directly with the EEOC or with a state or local agency. In New York, which has both state and local fair employment agencies, an individual who initially files a grievance with the state or local agency must file a charge with the EEOC within 300 days "after the alleged unlawful employment practice occurred," or within 30 days after receiving notice that the state or local agency has terminated the proceeding, whichever is earlier. 42 U.S.C. § 2000e-5(e)(1). If a charge is filed solely with the EEOC, it must be filed within 180 days after the alleged unlawful employment practice occurred. *Id.* However, these time limits are not jurisdictional and are, therefore, "subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.*, 455 U.S.

385, 393 (1982). Equitable tolling may be appropriate, for example, "where the plaintiff actively pursued judicial remedies but filed a defective pleading during the specified time period." *Brown v. Parkchester S. Condos.*, 287 F.3d 58, 60 (2d Cir. 2002)

In this case, it is not clear whether plaintiff failed to pursue her administrative remedies within the 300-day deadline. In her complaint, filed in August 2010, plaintiff alleged that she attempted to file a charge with the EEOC but was told that the EEOC lacked jurisdiction. Complaint at 2. This pleading did not allege precisely when plaintiff contacted the EEOC, or what adverse employment actions were the subject of her proposed charge of discrimination. Moreover, since it is clear that plaintiff actively pursued her administrative remedies – albeit ineffectively – it is impossible to entirely discount the possibility that equitable tolling might be appropriate in this case. Indeed, in her Proposed Amendment, plaintiff specifically alleged that she did not know whether the EEOC's claim that it lacked jurisdiction was "true," but noted that the equitable exhaustion requirement is "[s]ubject to waiver, E Stop [*sic*], and Equitable Tolling." Proposed Amendment at 4.

Defendant, which raises the time-bar argument in a footnote, does not address the issue of whether equitable tolling might be appropriate. Accordingly, this Court declines to dismiss plaintiff's discrimination claims arising from the Australian trip as time-barred and will reach the question of whether Defendant's actions relating to the trip took place under circumstances giving rise to an inference of discrimination.

Plaintiff has offered no admissible evidence that plaintiff suffered an adverse employment action in connection with the Australian trip, or that such adverse action took place under circumstances giving rise to an inference of discrimination. It is beyond dispute that plaintiff was aware that she qualified for the trip to Australia sometime prior to January 15, 2009, when she

29

electronically registered for the trip. Pl. EBT at 30; Tingey Declaration, Ex. 22. Although a secretary assisted plaintiff with the online registration, plaintiff remained "in front of the computer screen" throughout the registration process and was, therefore, in position to read any information supplied by the website. Pl. EBT at 30.

According to Megan Taylor, a Senior Program Manager in the Events Division of Pareto, the website advised registrants who did not hold a Canadian or American passport to contact the Australian Consulate to find out what documentation was required for entry into Australia. Taylor Aff. at ¶7. However, plaintiff, who held a Jamaican passport, apparently did not see this portion of the website. *See* Pl. EBT at 41. Based on Johnson's experiences in connection with a 2007 trip to Brazil, plaintiff mistakenly believed that Just Energy would obtain the visa for her. *Id*. at 42. Accordingly, plaintiff never contacted the consulate.

Plaintiff remained unaware that she needed to obtain a visa on her own until she and Johnson retrieved their itineraries from the Kew Gardens Office. *Id*. at 68. However, the two did not actually go to the Kew Gardens Office until February 27, 2009 – approximately one week before the trip was to begin. *Id*. at 261. Since the Australian authorities required that visa applications be made 15 days in advance, *id*. at 79, it was already too late to obtain the necessary visa.

Although it appears that plaintiff's missed the trip because of her misunderstanding regarding who was responsible for obtaining the visa, plaintiff nonetheless blames Langford, alleging that he deliberately withheld her itinerary because he did not want her to go on the trip. However, this theory assumes (1) that plaintiff needed a written itinerary in order to apply for an Australian visa, (2) that Langford knew of this requirement and the 15-day deadline, and (3) that Langford did not inform plaintiff that he had her itinerary in order to prevent her from going on

the trip. Plaintiff has adduced no evidence to establish any of these facts. First, plaintiff testified at her deposition that she did not know if she needed an itinerary to apply for a visa, *id*. at 66, and adduced no evidence relating to Australian visa applications or requirements. Second, plaintiff adduced no evidence that Langford knew of the visa requirements and the deadline. To the contrary, plaintiff has adduced evidence that other sales representatives received their itineraries five days prior to the trip but were able to go nonetheless. *Id*. at 61-62.

Third, plaintiff has produced no admissible evidence that Langford deliberately withheld the itinerary. Plaintiff testified at her deposition that, upon handing plaintiff and Johnson their itineraries, Delgado told them that the itineraries had arrived much earlier and that "everyone had already received theirs." *Id*. at 73. According to plaintiff, Delgado also said that she "didn't know why Chad did this," *id*. at 67, thereby implying that Langford deliberately withheld their itineraries. However, plaintiff has not provided an affidavit from Delgado, and has not suggested a hearsay exception which would permit Delgado statements to be introduced for the truth of the matter asserted therein.

Finally, even if Delgado's hearsay statements were admissible, they would not establish that Langford's actions were attributable to discriminatory animus. Although plaintiff alleges that she and Johnson – both of whom are Jamaican – received their itineraries late, they were not the only sales representatives to receive their itineraries so late. *Id*. at 61-62. Moreover, because plaintiff and Johnson worked as a team, the coincidence that they were the among the last to receive itineraries would not, standing alone, imply race or national origin discrimination. Indeed, plaintiff herself speculated that Langford did not want her to go on the trip because she listed Johnson as her roommate. *Id*. at 75. Accordingly, plaintiff has not established that any

31

adverse employment action she may have suffered in connection with the Australian trip took place under circumstances giving rise to an inference of discrimination.

### *Plaintiff's Termination in January 2009*

Plaintiff's Proposed Amendment implies that plaintiff is seeking to advance a discrimination claim in connection with her termination by Langford in January 2009. However, while plaintiff asserted at her deposition that her termination was "discriminatory," she testified that she herself did not believe that this discrimination was due to her race or national origin. *Id.* at 251. Instead, she speculated that Langford did not like her personally because of her role in luring Johnson away from the Kew Gardens Office.

In Plaintiff's Cross Motion, plaintiff correctly notes that her speculation "cannot be considered by the court" as proof of Langford's motives. Plaintiff's Cross Motion at 4. Nonetheless, this speculation serves to highlight the fact that plaintiff has no proof of a discriminatory motive. Indeed, plaintiff's claims of discrimination rest solely on allegations that she was treated differently from Sanders, who was suspended rather than fired. By plaintiff's own testimony, however, Sanders was a black woman of Jamaican descent. Pl. EBT at 165-66. Accordingly, even these allegations do not suggest that plaintiff's January 2009 termination took place under circumstances giving rise to an inference of race or national origin discrimination.

### *Plaintiff's Termination in July 2010*

In analyzing whether plaintiff has adduced sufficient evidence to establish that her termination took place under circumstances giving rise to an inference of discrimination, this Court notes that two distinct acts led to plaintiff's termination. First, Langford refused to allow plaintiff to transfer back to the Kew Gardens Office. Second, Siddiqui determined that plaintiff should not be permitted to market on her own.

32

### *Langford's Actions*

With respect to the refusal to permit plaintiff to transfer to Kew Gardens, this Court notes that Langford's actions occurred after plaintiff left the Kew Gardens Office twice: voluntarily in 2008 and involuntarily in 2009. After plaintiff left the Kew Gardens Office the first time, Langford made extraordinary efforts to lure plaintiff and Johnson back to his office. By plaintiff's own account, Langford "got a little happy" when those efforts succeeded and plaintiff and Johnson agreed to return in mid-2008. Plaintiff's Cross Mot. at 2.

In January 2009, Langford terminated plaintiff. As the Second Circuit has observed in other contexts, "where the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to [him] an invidious motivation that would be inconsistent with the decision to hire." *Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000) (quoting *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997)).[7] Indeed, as noted above, plaintiff herself did not believe that her termination was due to her race or national origin. Pl. EBT at 251. Rather, she speculated that Langford did not like her personally because of her role in luring Johnson away from the Kew Gardens Office.

Sometime after plaintiff was terminated, Johnson left the Kew Gardens Office for a second time to join plaintiff in the Wall Street Office. If Langford disliked plaintiff for luring Johnson away the first time, their relationship was unlikely to have improved when Johnson left the Kew Gardens Office for a second time. Accordingly, when plaintiff and Johnson jointly

---

[7]While the Second Circuit may not, in any reported opinion, have "pass[ed] judgment on the extent to which this [same actor] inference is either required or appropriate outside the [ADEA] . . . context in which it generally is applied," *Feingold v. New York*, 366 F.3d 138, 155 n. 15 (2d Cir. 2004), this Court notes that the Second Circuit has used this inference in unreported Title VII cases. *See, e.g., Filozof v. Monroe Cmty. Coll.*, 411 Fed. Appx. 423, 427 (2d. Cir. 2011) (summary order); *Mastrolillo v. Connecticut*, 352 Fed. Appx. 472, 474 (2d Cir. 2009) (summary order).

sought to be readmitted to the Kew Gardens Office, Langford – who had not wanted plaintiff and Johnson to work together, Pl. EBT at 92 – refused.

At her deposition, plaintiff conceded that there was nothing, aside from the mere fact that she and Johnson were not admitted, that made her believe that she had been discriminated against on the basis of race or national origin. Pl. EBT at 164. However, plaintiff presents no evidence regarding how many sales representatives sought to transfer from the Wall Street Office, how many were accepted into the Kew Gardens Office, and what the nationalities of those representatives were. Indeed, at her deposition, plaintiff could only recall the names of four sales representatives who transferred: Adler Porter, John, Lavonne and Tiara. Pl. EBT at 157. Plaintiff testified that three of these sales representatives were black, but she did not know the national origins of any of the three. *Id.* at 161-63. Plaintiff also did not know how many other sales representatives transferred, saying that there "probably [were] more," but that she could not estimate the "rough number." *Id.* at 157.

Even assuming that plaintiff and Johnson were the only two sales representatives rejected by Langford, this fact alone would not permit an inference of national origin discrimination. While plaintiff and Johnson are both Jamaican, they worked together closely as a team. In addition, they both reported to the Kew Gardens Office several days after the Wall Street Office closed, by which time other former Wall Street employees were already working at Kew Gardens. Moreover, plaintiff testified that several of the sales representatives who worked at the Kew Gardens Office during her tenure were black and/or Jamaican, and that at least one sales representative who was half Chinese and half Jamaican continued to work at Kew Gardens at the time of plaintiff's deposition. *Id.* at 216-22. In light of all of these circumstances, one cannot

34

infer solely from Langford's refusal to permit plaintiff and Johnson to join his staff that his actions had anything to do with their national origin.

### Siddiqui's Actions

There is also no evidence from which one could infer that Siddiqui's decision not to permit plaintiff and Johnson to market on their own was a product of race or national origin discrimination. Indeed, plaintiff herself testified that Jerome Jackson, a black man of Jamaican origins, *was* permitted to work independently after the Wall Street Office closed. *Id.* at 171-72. Plaintiff makes no effort to reconcile this fact with her allegations of discrimination.

### Defendant's Non-Discriminatory Rationale for Termination

Even assuming that plaintiff could make out a *prima facie* case of discrimination in connection with her termination, the evidence would not establish that Defendant's non-discriminatory reasons for Langford and Siddiqui's actions were merely a pretext for discrimination. The uncontroverted evidence establishes that, for almost two years after she began working for Just Energy, plaintiff was the subject of relatively few customer complaints or allegations. Only two customers complained about plaintiff during her first year on the job, and plaintiff had only three complaints leveled against her before mid-September 2009.

Beginning in mid-September 2009, however, the number of allegation made by customers against plaintiff increased. According to the IC Summary, there were two complaints against plaintiff during an eight-day period beginning September 16, 2009. *See* Tingey Declaration, Ex. 23. Another complaint was made against her on February 13, 2010. *Id.* All of these allegations were made sometime after the New York Attorney General had expressed concerns about the conduct of some of Defendant's sales representatives, and after Defendant had entered into an "Assurance of Discontinuance" or "AOD" with the Attorney General.

These closely spaced complaints, along with other complaints leveled against Johnson at approximately the same time, *see* Tingey Declaration, Ex. 8, triggered internal regulatory scrutiny, as reflected in e-mails in mid-March 2010. *See* Tingey Declaration, Exs. 24 & 25. Faced with responsibility for plaintiff's actions, Ali Zamany, who was plaintiff's Regional distributor at the time, blamed plaintiff, asserting that she did not show up for meetings and was "affecting . . . office demeanor." Tingey Declaration, Ex. 25. Zamany was apparently able to convince Siddiqui that plaintiff was at fault, for she and Zamany both requested that plaintiff be given a "final warning." *Id.* The Corporate & Customer Relations Department declined to do so, but Zamany exacted a promise that plaintiff would attend the morning meeting five days a week.

Two more customers complained about plaintiff before July 8, 2010, when the Wall Street Office closed amid charges of wide-spread fraud. When plaintiff did not arrive at the Kew Gardens Office until several days after the Wall Street Office closed, it would have been readily apparent to all concerned that plaintiff had not been visiting the Wall Street Office regularly. Indeed, while Langford does not explicitly state in his affidavit why he refused to admit plaintiff and Johnson to his office, Langford does state that plaintiff and Johnson had not regularly attended meetings when they worked in Kew Gardens and had customer complaints leveled against them. Langford Aff. at ¶¶9-10. In light of the increased regulatory scrutiny and the regional distributor's responsibility for ensuring compliance, it is obvious why Langford was not interested in having plaintiff and Johnson return.

Siddiqui had already been convinced by Zamany that plaintiff was a liability. She made that view clear to Morgan, expressing the view that plaintiff and Johnson "would potentially pose a risk to our business without the leadership and guidance of a Regional [Distributor] and the

benefits of visiting a Regional office on a regular basis." Tingey Declaration at Ex. 25. Accordingly, Siddiqui denied plaintiff permission to market on her own and terminated her.

In her responsive papers, plaintiff offers no evidence to show that this non-discriminatory explanation for plaintiff termination was pretextual. Plaintiff's Cross Motion explains in detail why the customer allegations were without merit, but plaintiff does not deny that these allegations were made. In addition, Plaintiff does not offer any evidence to suggest that Langford or Siddiqui were motivated by discriminatory animus. As explained at length above, the circumstantial evidence suggests that plaintiff's termination was based solely on business considerations, not discrimination. Accordingly, plaintiff has not shown that Defendant's non-discriminatory reasons for plaintiff's termination were merely a pretext for discrimination.

## CONCLUSION

For the reasons set forth above, defendant Just Energy's motion for summary judgment dismissing this case is granted. The Clerk of Court is directed to enter judgment in accordance with the Memorandum and Order and to close this case.

**SO ORDERED.**

' SANDRA L. TOWNES
United States District Judge

Dated: September 17, 2012
Brooklyn, New York